ROSA ALLEN WILLIAMS V. LOULA ALLEN SMITH.

No. A-1238. Decided November 26, 1947.
Rehearing overruled December 31, 1947.
(206 S. W., 2d Series, 208.)

*Baker, Botts, Andrews & Walne* (now deceased) and *Joseph C. Hutcheson, III,* for petitioner, Mrs. Rosa Allen Williams.

*Andrews, Kurth, Campbell & Bradley, F. L. Andrews* and *Homer Mabry,* for Mrs. Loula Allen Smith; *Fulbright, Crooker, Freeman & Bates, John H. Crooker* and *Leon Jaworski,* for the Second National Bank and John H. Crooker, Trustees; *Lester*

*Settegast,* for Clara Drouet; and *Walter E. Boyd,* for the Edwards minors, all of Houston, for respondents.

MR. JUSTICE FOLLEY delivered the opinion of the Court.

This is a suit to construe the will of Rosa C. Allen, deceased, and to require the trustees named in the will to make a partial distribution of the principal of the estate to the beneficiaries of one of the trusts created therein. It was originally filed by the petitioner, Rosa Allen Williams, and her two sisters, Mrs. Loula Allen Smith and Clara Dell Allen Drouet, the surviving daughters of Mrs. Allen. Before the trial the two sisters, having declined to proceed further as plaintiffs, were made defendants. Other defendants were the trustees under the will and the grandchildren and great-grandchildren of the testatrix. One of the sisters, Mrs. Drouet, completely reversed her original position and adopted the view of the trustees which was that no distribution should be made. The other, Mrs. Smith, adopted an intermediate ground. The trial court denied the construction of the will sought by Mrs. Williams, sustained that urged by the trustees, and refused any order of distribution. The Court of Civil Appeals affirmed the judgment of the trial court. 200 S. W. (2d) 201.

It is the contention of Mrs. Williams that under the will of her mother, and particularly under Section 6 of Article Six thereof, she and her two sisters are entitled to distribution of payments and proceeds received by her and the trustees upon the principal of certain vendor's lien notes, accounts and obligations of her mother's estate which had fixed maturities.

Mrs. Allen, the testatrix, died April 24, 1931. Surviving her were her three daughters, above named, and one son, Samuel Milton Allen, who died prior to the trial of this suit, leaving no children surviving him. The will, dated and published July 21, 1928, and a codicil, dated and published July

22, 1930, were admitted to probate in Harris County on May 12, 1931. The codicil is not material since it in no way modified the provisions of the will here in controversy. Mrs. Williams was named as independent executrix in the will, and she qualified and served as such until the administration was completed on December 31, 1938. On that date she delivered to John H. Crooker and the Second National Bank of Houston, as trustees, all the assets then remaining in her hands as executrix.

The will of Mrs. Allen is lengthy. A complete copy of it is appended to the opinion of the court of civil appeals. (200 S. W. (2d) 208-224). We shall summarize and quote only so much of it as we deem necessary to make this opinion complete within itself.

Article One directs the payment of all her debts without delay by her executrix, and provides that any estate, inheritance or death taxes or charges should be paid out of the residuary portion of her estate.

Article Two contains a special bequest of $5,000.00 in trust for the maintenance of Mrs. Allen's cemetery lot in Houston.

Article Three deals with her orally expressed wishes as to the distribution to her children of her jewelry, heirlooms and other personal effects. She states that she had from time to time made statements to them of her desires in that respect and felt sure her children would respect her wishes. She merely bequeathed those personal items to her children to be divided and distributed among them by their mutual agreement.

Article Four is a special bequest to her three daughters whereby she devised to them in fee simple certain real estate and mineral interests.

Article Five creates what is known as the "Loula Allen Smith Trust" wherein she devised and bequeathed her home in Houston and $50,000.00 to her trustees named therein to be held in trust for the benefit and use of her daughter, Mrs. Smith, and the two daughters of Mrs. Smith.

The above five articles of the will constitute all the bequests of the testatrix before she deals with the residuary portion of her estate. Those bequests have been executed in accordance with the expressed wishes of the testatrix, and there is no controversy with reference to them. They become important only

in so far as they shed light upon the intentions of the testatrix as expressed in Article Six of her will.

.   Article Six is in eight sections. Section 1 provides for the creation of a trust to be known as the "Rosa Allen Trust," and names the First National Bank of Houston and John H. Crooker as trustees. The First National Bank of Houston, and an·alternate trustee named in Article Six, declined to accept the trust, and the Second National Bank of Houston was duly appointed substitute trustee by the District Court of Harris County, as authorized by the will.

The first paragraph of Section 2 of Article Six devises and bequeaths to the trustees "all of the rest and residue of my property of every sort and character, real, personal and mixed, and wheresoever situated."

Section 3 gives the trustees broad powers with respect to handling and dealing with the trust property, which included the authority to sell or invest the same, and to change the form of the investment from time to time and reinvest the proceeds in other property.

Section 4 provides that the net income from the trust estate shall be distributed equally between her three daughters during their lives and the lifetime of the trust, with additional provisions, in the event of their deaths, for distribution of the net income to the children of her two daughters, Mrs. Smith and Mrs. Drouet.

Section 5 directs the trustees as to making reports and provides compensation for the bank trustee and for the appointment of substitute truseees.

Section 6 of Article Six is the provision directly involved in this suit. It provides that "all payments upon the principal" of all notes, accounts and obligations having fixed maturities owned by the testatrix at the time of her death, and which were to become a part of her residuary estate, should be distributed to her three daughters during their respective lifetimes. It further provides that these beneficiaries should "be paid and have distributed to them from time to time as hereinabove set out, all monies and proceeds arising from *payments upon the principal of* said vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities * * *." (Emphasis ours). It also provides that where the form of the

investments is changed from one having fixed maturities to some form having no fixed maturity, the provisions of that section should also apply, and that "payment and distribution shall be made to the beneficiaries hereof of *amounts corresponding with the payments that would have matured upon the principal* * * * had there been no reinvestment or change of form." (Underscoring ours). The interpretation of these provisions in connection with the will as a whole is the basis for all the controversies of this suit. With emphasis on these features of the will we quote Section 6 in full, as follows:

"Among other property included in this residuary article of my will, I now own and will in all probability at the time of my death own, a considerable number of vendor's lien notes arising from the sale to various persons, firms and corporations of different lands formerly owned by me, as well as other notes, accounts, debts and obligations due me, all of which have fixed maturities. With respect to each and all of the same I direct that the trustees hereunder deliver and distribute to the beneficiaries hereof all payments made upon the principal of each and all of said vendor's lien notes, other notes, accounts, debts and obligations, having fixed maturities, as aforesaid, such delivery and distribution to be made from time to time in the same manner, to the same beneficiaries and exactly in accordance with the distribution of the net income as hereinabove provided in Section Four of this article, the distributees and shares being fixed and determined from time to time in accordance with the said provisions of Section 4 of this article, based upon the date of payment to the trustees when such payment occurs on or subsequent to the fixed date of maturity, and on the date of maturity when such payment is anticipated or is made prior to the fixed maturity. If, for any reason, any of said vendor's lien notes, other notes, accounts, debts or obligations having fixed maturities are not paid promptly at their respective maturities, it shall be the duty of the trustees to use their best efforts to collect the same as promptly as possible, but if in their judgment the best interests of the trust estate will be served by an extension of any of said maturities the said trustees are expressly authorized to give any such extension or extensions from time to time. On the other hand, I desire that the beneficiaries hereunder shall be paid and have distributed to them from time to time as hereinabove set out, all moneys and proceeds arising from payments upon the principal of said vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities, and the trustees shall use every reasonable effort to effect such purpose. The beneficiaries

entitled to receive distribution from the trustees of payments made to the trustees upon account of the particular securities or obligations referred to in this section (those having fixed maturities) will at any given time be the same persons, sharing in the same proportions, as the persons then entitled to receive the income from the trust as provided in Section of this article. The provisions and directions with respect to payment of principal to beneficiaries as contained in this section shall apply only with respect to payments made upon the principal of said vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities which I may own at the time of my death, and shall not apply with respect to other property passing to the trustees under the provisions of this article. Under the powers and authorities given the trustees hereunder, it is entirely possible that they may sell or otherwise dispose of some vendor's lien notes, other notes, accounts, debts or obligations having fixed maturities, and that they may reinvest the proceeds from such sale or disposition in other property or securities or that said trustees may in some manner change the form of investment from that of vendor's lien notes, other notes, accounts, debts or obligations having fixed maturities into some form having no fixed maturity. In such event, the provisions of this section shall nevertheless apply and upon the dates from time to time of the fixed maturities as existed as of the time of my death of any said vendor's lien, notes, other notes, accounts, debts and obligations having fixed maturities, which may have been then reinvested or changed by the trustees into some form having no fixed maturity or a later maturity (this provision, however, not to apply to extensions or renewals to the same debtor) payment and distribution shall be made to the beneficiaries hereof of amounts corresponding with the payments that would have matured upon the principal of said vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities had there been no reinvestments or change of form.

"In like manner, it is entirely possible that said trustee may sell or otherwise dispose of some property other than such vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities (including real estate, stock and all other property included in this residuary article) and reinvest the proceeds of such sale or disposition in vendor's lien notes, other notes, accounts, debts or obligations having fixed maturities, or may change the form of investment which has no fixed maturity into some vendor's lien notes, other notes, accounts, debts, or obligations having fixed maturities. And in any such

event the provisions and directions for distribution contained in this section shall not apply to any payments made upon the principal of any such vendor's lien notes, other notes, accounts, debts and obligations having fixed maturities, which may be thus acquired after my death, and in such event all of such payments shall remain a part of the corpus of this trust estate and be reinvested, held, managed, and otherwise dealt with by said trustees as part of the corpus of said trust estate until the final termination thereof as herein provided."

Section 7 of the same article provides that "All of the property covered by this residuary article of my will, the distribution of which is not accomplished under the provisions of Section 6 hereof, shall be held by said trustees, and this trust shall continue for at least so long as any of my said three daughters, Rosa Allen Williams, Loula Allen Smith, and Clara Dell Allen Drouet, shall live." It further provides that at the death of the last surviving daughter, if Mrs. Smith and Mrs. Drouet had no descendants, the trust should terminate and all the property therein should pass to the son of the testatrix, Samuel Milton Allen, if then living, and, if not to his child or children; and if he was deceased and no surviving child or children, the same should pass to the heirs of the testatrix according to the laws of descent and distribution.

Section 8 provides for the termination of the trust, and distribution of all the trust estate to the heirs as above indicated, upon the death of the last surviving child of Mrs. Smith or Mrs. Drouet, or when the youngest child of these daughters attains the age of thirty-five years, provided that the three daughters of the testatrix should then be deceased.

Rosa Allen left an estate of the total appraised value of $1,038,036.52, of which only $17,237.44 was in cash. Among other assets were several parcels of real estate, a substantial portion of which was made the subject of special bequests to her three daughters. Other assets consisted of stocks, bonds, vendor's lien notes, and other accounts receivable.

At the time of her death the testatrix owed the First National Bank in Houston $55,213.90, and was accommodation endorser on notes aggregating $16,000.00 executed by her three daughters. The estate and inheritance taxes paid by the executrix aggregated $50,903.46. There were other debts and claims in the sum of $47,511.34, making the total debts owing by the estate in the sum of $169,628.70. In addition to that she owed income taxes in the sum of $42,918.99.

To liquidate this indebtedness, and to satify the cash bequests made in Article Two and Five of the will, totaling $55,000.00, as well as to pay large administration expenses, the executrix used monies she collected from time to time on various assets of the estate, including proceeds from the sale of stocks and bonds and payments on vendor's lien notes and other accounts. The monies thus collected were sufficient to pay taxes, debts, expenses, and cash bequests without the necessity of the sale of assets at unfavorable market prices. Out of the cash so collected the executrix delivered to herself and her two sisters the sum of $43,735.56 in 1935 and 1936, which the trial court found was not authorized by the will; however, this payment becomes immaterial under our subsequent holdings. From stocks sold or called Mrs. Williams received as executrix the sum of $104,433.38. From bonds sold or collected at maturity she received $34,998.50. On vendor's lien notes she collected $125,534.-77, and on contracts for the sale of land she collected $4,669.90. Income collected to December 31, 1938, as distinguished from proceeds from principal, amounted to $100,325.77.

Total disbursements during her administration, including taxes, debts, cash bequests, administration expenses, and the $43,735.56 delivered to herself and her sisters, amounted to a total of $424,277.33. The administration expenses were substantial, and included a total of $41,159.15 for legal services, and $30,906.92 for fees to the executrix. At the conclusion of the administration there remained in the hands of the executrix the sum of $6,562.60, which was all the cash remaining out of the amounts collected by her and not used to pay debts, prior bequests and costs of administration. This amount she delivered to the trustees at the close of the administration on December 31, 1938, along with the other assets of the estate.

Out of the sums collected by the executrix during her administration there was $165,001.67 received from notes and obligations having fixed maturities. The sum of $114,703.53 of that amount was used by the executrix in payment of debts, prior bequests and expenses of administration. The remainder is accounted for in the $43,735.56 the executrix distributed to herself and her two sisters, together with the $6,562.60 she paid over to the trustees at the close of the administration. The petitioner claims that under the doctrine of marshalling of assets she and her sisters are entitled to reimbursement for the $114,703.53 used in paying debts and other charges of the estate. She also insists that the $6,562.60 which she paid over to the trustees at the close of the administration should be likewise distributed, as well as $12,065.00 collected by the trustees

upon debts, and obligations with fixed maturities since the *close* of the administration.

Among the assets of the estate were six vendor's lien notes executed by Greater Houston Improvement Company, payment of which was secured by a first lien on 973.59 acres of land in Harris County. One of these notes was in the principal sum of $35,612.90, and each of the other five was in the principal sum of $67,891.35, totaling $375,069.65. The first mentioned was due June 27, 1937, and the others annually thereafter from one to five years respectively. Prior to the maturity dates of any of these notes default was made in the interest payments, and suit was filed by the executrix for judgment and foreclosure of the vendor's lien upon the whole indebtedness. Judgment was rendered on November 15, 1933, for $507,309.00, which included the $375,069.65 principal due on the notes, together with interest and attorney's fees. That judgment bore interest from its date at the rate of 10% per annum. The land was sold under order of sale on May 4, 1937, at which time the executrix acquired the property for the estate by bidding the sum of $375,-000.00, which bid was credited on the judgment. At the time of the foreclosure sale interest had accrued in the sum of $175,-832.37, making the full amount due on the judgment at that time in the sum of $683,141.37. The trial court found that on the date of the sale, the land had a reasonable market value of $250,000.00. No attack was made upon that finding. At the close of the administration the land was turned over to the trustees. In 1945 the trustees sold 53.48 acres of it for $850.00 per acre. The remainder was shown to be worth $600.00 per acre at the time of the trial, or $552,066.00. No intervening values of the land were shown.

The petitioner insists that the foreclosure of these vendor's lien notes and the repossession of the land securing them constituted a change in the form of the investment within the meaning of Section 6 of Article Six of the will which provided that if such a change occurred sums equal to the principal amount of the notes should be distributed to the beneficiaries on the maturity dates of the notes. In the alternative, she asserts that the foreclosure sale and purchase of the land constituted payment of the notes within the meaning of the will which likewise requires the trustees to distribute to the beneficiaries the proceeds from the sale.

■ We shall first dispose of the rights of the parties with reference to reimbursement of the sum of $114,703,51 collected from

notes and accounts having fixed maturities and used by the executive to pay debts, prior bequests, and expenses of administration.

This demand is based upon the proposition that Section 6 of Article Six is either a specific bequest of the proceeds of the obligations having fixed maturities, or is a demonstrative bequest, or is a general bequest, which, in either event, is to be preferred over the general bequest of the ultimate residuary estate which was to be distributed only upon the termination of the trust.

Regardless of the technical designation to be applied to that portion of the residuary estate subject to distribution, We are of the opinion that the will taken in its entirely indicates an intention that only such property as remained after the payment of prior legacies, debts, taxes, charges, and expenses, should pass to and become a part of the residuary estate. If this analysis be correct, then no occasion exists for the application of doctrine of marshalling of assets.

The bequest to the trustees, in Section 2 of Article Six included "all the rest and residue" of the property of testatrix "of every sort and character, real, personal and mixed, and wheresoever situated." It must be presumed that the terms "rest and residue" were used in their noraml, usual and legal sense, with the result that nothing would pass to the trustees until all prior bequests, debts, and expenses of administration had been paid. Several provisions of the will indicate that the testatrix intended that payments on vendor's lien notes and other obligations having fixed maturities, which might be collected by the executrix, should be used by her to pay the prior bequests, debts and expenses.

In Article One the testatrix states that all debts should be paid without delay, and that "any estate, inheritance or death taxes or charges shall be paid by my executor out of the residuary portion of my estate and shall not be charged against special bequests." That provisions shows that the testatrix considered the residuary portion of her estate as a unit and distinguishes it from the bequests made in Articles Two, Three, Four and Five of the will. In Section 3 of Article Six she expressly authorizes the trustees to sell or dispose of the notes and obligations, to extend the time of payment when necessary, and to change the investments into some form having no fixed maturities. In Section 4 of Article Six she also provides that

"no beneficiary hereunder shall have any right, title, claim or interest in, to or unto said trust estate nor any part or parcel thereof, prior to the distribution thereof, and shall have no right to convey, transfer, assign, pledge, mortgage or otherewies encumber said estate, nor any part thereof, nor any interest prior to distribution thereof." Those provisions indicate that the testatrix did not intend to invest in the beneficiaries any character of ownership in the securities themselves, and negative the idea that they should have any interest in the funds derived from them which were necessary for the payment of prior bequests, debts and expenses of administration. Moreover, if special bequests had been intended in the residuary clause, no reason is seen, and none is suggested, for placing the obligations in the residuum. It would have. been an easy matter for the testatrix to exclude them from the residuary clause and to dispose of them specifically in prior sections of the will as she did other properties. This she chose not to do.

■ Although it is possible to have a specific bequest in a residuary article of a will, it is an unusual disposition of property, and can become effective only when the intention of the testator is clearly to that effect. In other words, it is conceivable that by language different from that involved here, a testator could disclose an intention to make a specific bequest when he is dealing with the residue of his estate. However, we cannot read a specific bequest into a residuary article when the property is referred to as being "Among other properties included in this residuary article", or when similar language is used showing that the property, though specifically mentioned, is treated merely as part of the residuum. Kemp v,. Dandison, 169 Mich. 578, 135 N. W. 270; Orr v. Griffith, 188 Ark. 428, 65 S. W. (2d) 556; Bristol v. Stump, 136 Md. 236, 110 Atl. 470; Daiss v. Hanes, 85 Col. 397, 277 Pac. 5.

We therefore conclude that it was the intention of the testatrix to pass to the residuary portion of the estate only such property as remained after the payment of all legacies prior to Article Six, and all debts, taxes, charges and expenses of administration. It thus becomes unnecessary to determine the character of the legacy involved in Section 6. Since the monies collected from the obligations in question were used for the payment of debts and other prior charges in keeping with the intention clearly expressed by the testatrix, the beneficiaries are not entitled to reimbursement for the $114,703.51 so expended.

■ This holding, however, does not preclude the right of distribution with reference to certain funds and assets derived from these securities which remain in the residuum after the the payment of the prior claims and obligations. It is to these that we now direct our attention.

As above indicated, under the provisions of Article Six the net income from the residuary property was to be distributed to the three daughters during their lives, and thereafter to the children of two of her daughters, and finally, at the termination of the trust, all of the corpus of the property remaining in the trust estate, including the accumulated income, was to be distributed to the heirs of the testatrix. In addition to this, during the existence of the trust, the beneficiaries were also to have distributed to them the payments and proceeds received upon the principal of the obligations with fixed maturities, and certain sums if the form of the investments was changed. It is thus clear that the testatrix was expressing the intention of providing for the distribution of certain sums at stated times to her daughters in excess of the net income, while at the same time leaving the remainder of the residuary estate free for ultimate distribution to other heirs under the terms of Section 7 of Article Six.

With this dominant purpose in mind we have little difficulty in determining that the beneficiaries are entitled to have distributed to them the $6,562.60 which was paid over to the trustees at the close of the administration, and the further sum of $12,065.00 collected by them since the close of the administration upon debts and obligations having fixed maturities. The $6,562.60 represents an excess over and above the amount necessary for the payment of prior obligations, which were discharged in part by monies derived from obligations having fixed maturities. The beneficaries are entitled to such excess. For the same reason they were entitled to receive the $43,735.56 distributed by the executrix. The large portion of the $12,065.00 collected since the close of the administration was from bonds having fixed maturities, but the language of the residuary clause was broad enough to include them. The remainder was collected from executory contracts for the sale of land which also had fixed maturities, and these obligations were included as assets to be distributed upon collection. None of the $12,065.00 was necessary to pay prior claims or charges, and therefore the beneficiaries are entitled to receive it under the plan and unmistakable terms of the will.

■ The land involved in the foreclosure suit, the major portion

of which is now held by the trustees, presents a more serious problem. The solution would be simple if the land had been sold to someone other than the executrix. In that event, assuming it would have sold for less than the face value of the notes, it could not be doubted that the beneficiaries would now be entitled to receive the entire proceeds, either as representing a payment on the principal of the notes or as net income derived therefrom. However, the land was purchased by the executrix at a bid of $375,000.00 when it was indisputably worth only $250,000.00. In effect, therefore, she then received land, or fruits, or proceeds of the value of $250,000.00. But the fact that she exercised her best judgment and purchased the land, instead of allowing it to be sold to a third party possibly at a sacrifice, should not, in our judgment, destroy all rights of distribution which otherwise would have resulted.

It is of no consequence that the foreclosure sale was by the executrix rather than the trustee. The executrix was equally bound by the terms of the residuary clause, and there is no intimation that she was unfaithful to the trust. The clear intention expressed in the will should always govern, and all persons, whether executors, trustees, legatees, or other parties interested, are bound by its directions. State Bank of Chicago v. Gross, 344, Ill. 512, 176 N. E. 739; Commissioner of Internal Revenue v. Citizens and Southern National Bank, 147 Fed. (2d) 977. The action of the executrix can thus be considered the action of the trustees, and the result will be the same.

It is insisted by respondents that the testatrix had in mind only voluntary cash payments when she referred to "payments made upon the principal," or "all monies and proceeds arising from payments upon the principal, ." and that she meant only cash sales when she referred to "amounts corresponding with the payments upon the principal" when the form of the investment was changed, and, hence, there could be no distribution when land, rather than money, was received in an involuntary foreclosure sale. With that contention we are not in accord. We would thus be giving to each separate provision of the residuary clause a narrow or strict construction which would deprive the beneficaries of every benefit from the funds, proceeds or fruits of the transaction by reason of the exigencies arising in the administration of the estate, rather than giving effect to the dominant purpose and intention of the testatrix as shown from the will as a whole. From the entire instrument, the conclusion is inevitable that she intended the present bencficaries to receive the benefits arising out of foreclosure transaction.

Once this conclusion is reached there remains the necessity for a court of equity to determine the amount and character of the distributions due the beneficaries, and the date they became due.

Regardless of the credits allowed upon the foreclosure judgment, it was the land, or rather its value, which was received as the fruits or proceeds from the vendor's lien notes. Whether the same is to be considered as a payment, or a change in the form of the investment, is immaterial. In either event it is the fund, and all the fund, which replaced the notes, and irrespective of its character the beneficiaries are entitled to receive certain benefits by reason of it. Any other construction would do violence to the purpose and intention of the testatrix. This does not mean that the land itself should be distributed. By mutations in the securities it has become a portion of the residuary estate, and as such it is not to be distributed; but its value constitutes a fund from which equity requires a distribution in accordance with the expressed wishes of the testatrix.

Section 6 of Article Six provides that the distributees and the shares to be distributed are to be fixed and determined upon the date of payment of the notes or obligations when "such payment occurs on or subsequent to the fixed date of maturity, and on the date of maturity when such payment is anticipated or is made prior to the fixed maturity." It also provides that the provisions of the section should apply when there was a change in the form of the investment, in which event the maturity date of the obligation would govern the distributions. The foreclosure sale occurred prior to the maturity date of any of the notes, and therefore the identity of the distributees and the amount of the shares due them were fixed as of the maturity dates of the respective notes. The fact that two of the notes became due prior to the time the trust properties were delivered to the trustees will affect only the time for distribution. It will have no effect on the amount to be distributed.

The amount of the shares for distribution should be determined by the fair market value of the land, or the value of the fund, at the respective maturity dates of the original notes. Thus on June 27, 1937, the maturity date of the first note, there accrued to the beneficiaries a fund equal to the face value of the principal of that note, assuming that the fair market value of the land was then sufficient to cover the amount. Likewise, at the maturity date of each succeeding note there accrued

another fund equal to the face value of the principal of that note, again assuming that the fair market value of the land upon each date was sufficient to cover the amounts so fixed, less, in each instance, the value of the amounts theretofore determined to be payable on the prior notes.

Section 4 of Article Six, however, provides that all payments to the beneficaries should be made at such intervals as may be reasonable and consistent with the provisions of the article, but that in no event should "such payments be made less frequently than twice each year." It therefore follows that, although the rights of the beneficaries were fixed as of the maturity dates of the notes, the trustees might in their discretion delay payment for a period of six months. No demand for distribution could rightfully have been made before the expiration of that period. At the time the amounts of distribution were fixed as to the first two notes the fund had not yet become a part of the residuary estate; consequently no distribution could then have been made by the trustees. The time for distribution of the amounts fixed by reason of those notes would be within six months from the time the trust assets were delivered to the trustees. The time for distribution of the funds fixed by the remainder of the notes would be within six months from their respective maturity dates. This construction of the instrument will necessitate findings as to the value of the entire land at each maturity date of the six notes. From those findings it may be equitably determined what amounts accrued to the bene-ficiaries at each of those dates and which should have been distributed at the times indicated.

The same provision of the will governs the time for distribution of the other two sums which we have above determined to be due the beneficiaries. The first amount in the sum of $6,562.60 should have been distributed not later than six months from the time the trust assets were delivered to the trustees. The $12,065.00 represents several obligations with different maturity dates, and each fund comprising that amount should have been distributed not later than six months from the maturity date of the particular obligation.

■ The last point made by the petitioner is that interest at the rate of six percent per annum should be paid upon each of the sums which should have been distributed. This assignment we must also sustain.

Unless prohibited by the terms of the will or by statute,

it is the general rule that pecuniary legacies bear interest from the time they are due and payable. Interest is not imposed on the executor or trustee as a penalty for his default or neglect; nor is the right to receive it affected by delay in the administration or by suit to contest or construe the will. It is awarded purely as an incident of, or accretion to, the legacy itself as compensation for the loss the beneficiary suffers by reason of the delay. State Bank of Chicago v. Gross, 344 Ill. 512, 176 N. W. 739; Esmond v. Brown, 18 R. I. 48, 25 A. 652; Woodward's Estate v. Holton, 78 Vt. 254, 62 A. 718, 6 Ann. Cas. 524; Mont. v. Dunham, 106 Mass. 586; Davidson v. Rake, 44 N. J. Eq. 506, 16 A. 227; Claflin v. Holmes, 202 Mass. 157, 88 N. E. 664; In re Brandon's Estate, 164 Wis. 387, 160 N. W. 177; O'Leary v. Smock, 95 N. J. Eq. 276, 119 A. 23, 122 A. 927; 69 C. J. 1260, Sec. 2642; 28 R. C. L. 353, Sec. 353.

The reimbursement for this loss to the beneficiaries herein is neither prohibited by the language of the will nor by the statutes of this state. Thus all of the amounts for distribution should bear interest at the legal rate from the dates when the same should have been paid; and the sum allowed therefor should be charged to assets of the residuary estate other than the fund created by the foreclosure sale. Mills v. Baird, 147 S. W. (2d) 312, writ refused.

Since there are no findings as to the value of the land at the dates specified, we are unable to render judgment for all the distributions due. We therefore reverse the judgments of both courts below and remand the cause to the district court for retrial in accordance with this opinion.

Opinion delivered November 26, 1947.

Rehearing overruled December 31, 1947.